STATE of Alaska, Northern Southeast Regional Aquaculture Association, and Southern Southeast Regional Aquaculture Association, Appellants,

v.

Wayne ALEX, William A. Thomas, Jr., Ed Maki, John C. Martin, Warren S. Westrom, Dick Workman, Mark W. White, Carl Sims, Bruce R. Gilbert, Fred Chambers, Douglas D. Karns, Harold D. Bieleski, and Leo R. Albecker, Jr., Appellees.

Nos. 5065, 5086 and 5142.

Supreme Court of Alaska.

April 23, 1982.

G. Thomas Koester, Asst. Atty. Gen., Avrum M. Gross and Wilson L. Condon, Attys. Gen., Juneau, for appellant State of Alaska.

Fred J. Baxter, Baxter & Douglas Law Offices, Juneau, for appellant Northern Southeast Regional Aquaculture Ass'n.

Douglas Pope, Wagstaff, Middleton & Pope, Anchorage, for appellant Southern Southeast Regional Aquaculture Ass'n.

M. T. Thomas and W. G. Ruddy, Robertson, Monagle, Eastaugh & Bradley, Juneau, for appellees.

Before RABINOWITZ, C.J., CONNOR, BURKE and MATTHEWS, JJ., and BLAIR, Superior Court Judge.*

## OPINION

BURKE, Justice.

This case involves a suit brought as a class action by several commercial fishermen against two private aquaculture associations and the state. The suit sought a declaratory judgment holding unconstitutional a state statute that authorizes the associations to collect mandatory assessments on the sale of salmon by the plaintiff fishermen. In addition, the complaint sought a refund of all assessments that had been paid by the fishermen and a permanent injunction to restrain future collection of the assessments.

The plaintiffs alleged that the assessment statute was invalid on two grounds. First, they contended that the statute created a state tax dedicated to a special purpose in contravention of the express prohibition of dedicated taxes contained in article IX, section 7 of the Alaska Constitution. Second, they alleged that the delegation of the state's taxing power to private "regional aquaculture associations" was prohibited under article X, section 2 of the Alaska Constitution, which allows the state to delegate its taxing power to boroughs and cities only. Also, the plaintiffs maintained that the legislature's power to decide to tax is

---

* Blair, Superior Court Judge, sitting by assignment made pursuant to article IV, section 16 of the Constitution of Alaska.

inherently nondelegable, and therefore the decision to implement a tax cannot be made by an administrative official.

The aquaculture associations and the state answered, alleging that the statute was constitutionally valid. In addition, the answers attacked the plaintiffs' status as representatives for the class action. Also, the defendants affirmatively alleged that the claims were barred by laches and a failure to exhaust administrative remedies.

After some discovery, the merits were presented to the trial court by cross-motions for summary judgment. The trial court granted the plaintiffs partial summary judgment. The court held the assessment statute unconstitutional both because it created a dedicated tax and because it was an improper delegation of the legislature's taxing power. Also, the court certified the suit as a class action. The court entered a final judgment as to these issues, pursuant to Civil Rule 54(b).

The associations and the state now appeal, contending that the trial court erred in finding the statute unconstitutional and in certifying the class, and in not dismissing the action on the grounds of laches and failure to exhaust administrative remedies. We affirm. In order to aid the legislature in devising an aquaculture program consistent with the Alaska Constitution, we discuss each ground on which this scheme is allegedly unconstitutional.[1]

## I. THE SALMON ASSESSMENT AND THE FISHERIES ENHANCEMENT LOAN PROGRAM.

AS 16.10.530, the particular section that the trial court found unconstitutional, provides for an assessment on the sale of salmon by commercial fishermen to processors. The amount and conditions of an assessment are first proposed by a "qualified regional association." The assessment must then be approved by a majority of those holding limited entry fishing permits in the association's region. Finally, the Commis-

sioner of Commerce and Economic Development then must determine that all required procedures have been followed and that the assessment is "reasonable." The section notes that the assessments are for the purpose of providing revenue for the associations.

The relevant portions of section 530 provide:

*Royalty assessment on sale of salmon.* (a) The commissioner, on request of the qualified regional association for the area in which the royalty assessment is to be levied, after consultation with the commissioner of fish and game and after reaching any necessary agreements with local governments, shall establish areas in which a royalty assessment shall be levied on the sale of one or more species of salmon caught by persons holding entry permits under AS 16.43.010–16.43.380, in the area in which the royalty assessment is to be levied. A request by the qualified regional association shall include a description of compliance with (e) of this section. The commissioner shall determine whether the procedural requirements under (e) of this section were followed and whether the proposed assessment is reasonable. A royalty assessment levied under this section shall be for the purpose of providing revenue for the qualified regional association for the area in which the royalty assessment is made. The rate and conditions of royalty assessments, including species to be involved, shall be stated by the appropriate qualified regional association in conjunction with the request to the commissioner under this subsection. The royalty assessment may be equal to either two or three per cent of the fair market value of the fish but may not exceed three per cent of the fair market value of the fish.

. . . .

(c) The commissioner and the appropriate qualified regional association must agree on a means of collection of the

---

1. The legislature has already enacted a new salmon enhancement tax. AS 43.76; Ch. 154 SLA 1980. However, the new legislation did not repeal the tax which is reviewed in this opinion.

royalty assessment and the commissioner may, by regulation, require its collection by buyers of the salmon upon the sale of which a royalty assessment is levied.[2]

. . . .

The "qualified regional association" referred to in section 530 is defined in section 380:

> Regional associations. (a) The commissioner shall assist in and encourage the formation of qualified regional associations for the purpose of enhancing salmon production. A regional association is qualified if the commissioner determines that
>
> (1) it is comprised of associations representative of commercial fishermen in the region;
>
> (2) it includes representatives of other user groups interested in fisheries within the region who wish to belong; and
>
> (3) it possesses a board of directors which includes no less than one representative of each user group that belongs to the association.
>
> (b) In this section "user group" includes, but is not limited to, sport fishermen, processors, commercial fishermen, subsistence fishermen, and representatives of local communities.

The section 530 assessments are an integral part of the Fisheries Enhancement Loan Program Act, AS 16.10.500–.620. The act provides for "fishery enhancement loans" to qualified regional associations for hatchery construction. These loans are to be given based on the ability of an association to establish an equity in the hatchery through the use of the section 530 assessments, or by other means. AS 16.10.520(b). In addition, the loans must be secured by collateral such as the hatchery itself, sale of surplus hatchery fish, and the section 530 assessments. AS 16.10.520(c).

The assessment provisions of section 530 have been implemented in regulations promulgated by the commerce department. 3 AAC 88.010–.900. These regulations set out the required contents of requests by an association for a section 530 assessment. 3 AAC 88.020. The requests must set out the particulars of the area, conditions, period, rate, procedures for collection, and the species of salmon for the assessment. 3 AAC 88.020(b)(1)(A)–(G). The commissioner then reviews the assessment requests and

2. AS 16.10.530(e) and (f) go on to set out in detail the election procedures to be followed in obtaining ratification of an association's proposed assessment by limited permit holders:

> (e) Before a royalty assessment is made under this section, the qualified regional association for the area in which the royalty assessment is to be levied shall hold an initial public meeting to explain and discuss the necessity for the royalty assessment and to explain the registration procedure established under (f) of this section. Reasonable public notice of the meeting shall be sent to all limited entry permit holders actively participating in a fishery in the area, posted in at least three centrally located public places in the area, and published in at least one newspaper of general circulation at least one time a week for three consecutive weeks in the area, if one exists. The notice shall briefly state the amount of the royalty assessment and a short general description of the purposes for which the royalty assessment money will be used. A ballot shall be mailed to all limited entry permit holders actively participating in a fishery in the area at least 20 days before the initial public meeting and contain a copy of the notice and ask the question whether a royalty assessment shall be imposed. At the public meeting the returned ballots shall be counted by a special committee appointed by the regional association for that purpose, and a vote by written ballot shall be taken on the question from among the limited entry permit holders present at the initial public meeting. After the vote is taken at the initial meeting a second public meeting shall be held, upon the limited notice of publication in a newspaper of general circulation, each day for five consecutive days and the mailing of personal notice to all limited entry permit holders who actively participate in a fishery in the area at least 14 days before the second public meeting, to give those who did not vote by written ballot at the initial public meeting an opportunity to vote. These votes shall be counted with the votes counted at the initial meeting. A majority vote for the royalty assessment is required from the combined total of the returned ballots and the votes by ballot cast at both public meetings, before a royalty assessment may be imposed. No person may vote twice.
>
> (f) The qualified regional association shall establish standard registration procedures for voting on royalty assessments under this section.

decides whether the request is consistent with the act, based on factors such as the "reasonableness of the assessment in view of the projected activities of the regional association" and "the likelihood of promoting, through the assessment, the interest of the public in fostering salmon enhancement efforts." 3 AAC 88.030(a).

The assessments are then collected by commercial buyers of salmon and forwarded directly to the particular association's trust account. 3 AAC 88.020(b)(1)(H), 88.-040(b), (c), 88.900(2).

II. DO THE ASSESSMENT PROVISIONS OF AS 16.10.530 DEDICATE THE PROCEEDS OF A STATE TAX OR LICENSE TO A SPECIAL PURPOSE IN CONTRAVENTION OF ARTICLE IX, SECTION 7 OF THE ALASKA CONSTITUTION PROHIBITING DEDICATED TAXES?

Article IX, section 7 of the Alaska Constitution states in relevant part: "The proceeds of any state tax or license shall not be dedicated to any special purpose . . ."[3]

Plaintiffs contend that section 530 and its implementing regulations create a dedicated tax that violates the above constitutional prohibition. The trial court agreed, concluding that in creating the salmon assessment the state had "dedicate[d] a tax on the harvest of a natural resource of the State to a specific purpose."

The associations and the state contend that the trial court erred in finding a prohibited dedicated tax. First, they maintain that on its face section 530 makes no dedication of revenue. Second, they maintain that the assessments levied under section 530 are not "proceeds of a state tax or license" so as to be subject to the nondedication provision of section 7. Third, even if section 530 does dedicate a tax, they contend that a qualified incorporated regional association is a service area in the unorganized borough and as such is not subject to the nondedication provision. Fourth, the

defendants claim that the natural resources provisions of article VIII of the constitution allow dedicated taxes to be used in carrying out the enumerated powers of the article.

Each of the defendants' contentions are examined below. None has merit and, therefore, we affirm the trial court on this issue.

A. *Does AS 16.10.530 on its Face Make a Dedication of Revenues to a Special Purpose?*

The most relevant sentence of section 530 reads:

A royalty assessment levied under this section shall be for the purpose of providing revenue for the qualified regional association for the area in which the royalty assessment is made.

AS 16.10.530(a). The state contends that this sentence is in effect directory and not mandatory. It contends that it is merely an expression either of the legislature's motivation for enacting the assessment provision, or of the present legislature's policy commitment to appropriate matching monies from the general fund on a continuing basis in the future. Since such an expression of present policy is merely directory, the state argues that the current administration and future legislatures would be free to do as they please with the assessment funds, subject only to a moral obligation to carry out the policy of the originating legislature. The state's argument continues that since the statement of purposes is not binding, the statute should be construed to allow deposit of the assessments into the general fund, unearmarked, thereby avoiding a conflict with the constitutional prohibition.

This court has previously noted its intention to narrowly construe statutes to avoid constitutional infirmity where that can be done without doing violence to the legislature's intent. *Bonjour v. Bonjour*, 592 P.2d 1233, 1237–38 (Alaska 1979). However, only a reasonable construction may be

---

**3.** The section goes on to state:
except as provided in section 15 of this article [creating the permanent fund] or when required by the federal government for state participation in federal programs. This pro-

vision shall not prohibit the continuance of any dedication for special purposes existing upon the date of ratification of this section by the people of Alaska.

placed on a statute in this manner, because giving the statute an unintended meaning "would be stepping over the line of interpretation and engaging in legislation." *Gottschalk v. State*, 575 P.2d 289, 296 (Alaska 1978).

■ In the present case, the state's reading of section 530 does not square well with the manifestations of legislative intent contained in other provisions of the Fisheries Enhancement Loan Act. First, the sentence in question uses the verb "shall" in stating the purpose of the assessments. While not itself conclusive, the use of "shall" indicates that the use of the assessments for the funding of the aquaculture associations is mandatory.

Second, the legislative intent to create a dedicated fund under the ownership and control of the associations is indicated by the act's provisions contemplating that the commissioner is to consider an association's rights to the assessments in deciding whether the associations will be able to establish eventually sufficient equity in the hatcheries they build to make the loans secure, AS 16.10.520(b), and allowing the assessments to be pledged as collateral for the state loans, AS 16.10.520(c). These provisions are nonsensical if the assessments are not earmarked in some way so that the association has a "right" to them.

From the above, it appears that the legislature intended to dedicate the proceeds of the assessments to the associations.

### B. *Are the Assessments "Proceeds of a State Tax or License" Within the Meaning of Section 7?*

The associations and the state contend that the salmon assessments are not "proceeds of a state tax or license" so as to be subject to the constitutional prohibition against dedication. They premise their argument on a distinction between "general revenue taxes" and "special assessments" for services. The basic distinction they set forth is that special assessments are related to the benefits received, while general revenue taxes are related to an ability to pay, regardless of benefit to the taxpayer. They contend that "tax," as used in article IX, section 7 of the state constitution, does not include such "special assessments," but instead refers only to general revenue taxes. The defendants then maintain that the salmon assessment is a "special assessment" not subject to section 7.

The word "tax," like most English words, has several meanings or senses. In its broad sense, the term "tax" includes assessments as a kind of tax; however, in a narrower sense, the term "tax" refers to a general levy without reference to benefits conferred while "assessment" refers to an imposition based on benefits conferred. *Black's Law Dictionary* 1629 (rev. 4th ed. 1968). (See also the definition of "special assessment": "a specific *tax* levied on private property to meet the cost of public improvements that enhance the value of the property." *Webster's New Collegiate Dictionary* 1116 (1974) (emphasis added)). Therefore, the sense in which "tax" is used in article IX, section 7 of the constitution must be determined from its context, both in the text and according to the discussions at the constitutional convention which adopted the wording.[4]

---

4. In a long line of cases prior to 1978 this court had reaffirmed its reliance on the "plain meaning" rule in interpreting enacted law. *Poulin v. Zartman*, 542 P.2d 251, 270 (Alaska 1975) *on rehearing*, 548 P.2d 1299; *Roderick v. Sullivan*, 528 P.2d 450, 453–55 (Alaska 1974); *Alaska Public Employees Ass'n v. State*, 525 P.2d 12, 14-15 (Alaska 1974); *State v. City of Anchorage*, 513 P.2d 1104, 1109 (Alaska 1973); *Homer Electric Ass'n v. City of Kenai*, 423 P.2d 285, 289 n.22 (Alaska 1967); *Application of Babcock*, 387 P.2d 694, 696 (Alaska 1963); *Alaska*

*Mines & Minerals, Inc. v. Alaska Indus. Bd.*, 354 P.2d 376, 379 (Alaska 1960). The rule stated, "[w]here the meaning of a statute is apparent, there is no need to resort to methods of statutory construction." *White v. Alaska Ins. Guaranty Ass'n*, 592 P.2d 367, 369 (Alaska 1979).

However, in the recent case of *North Slope Borough v. Sohio Petroleum Corp.*, 585 P.2d 534, 540 n.7 (Alaska 1978), we expressly "reject[ed] the so-called 'plain meaning' rule as a strict exclusionary rule." We then went on to

The origin of section 7's prohibition of earmarking can be traced back through the constitutional convention records to the Alaska Statehood Commission's studies which were prepared for the use of the delegates at the convention.[5] One of the studies noted that "[t]he most severe obstacle to the scope and flexibility of budgeting results from the earmarking or dedication of certain revenue for specified purposes or funds." 3 Alaska Statehood Commission, Constitutional Studies pt. IX, at 27 (1955). The study stated that one of the key reasons for the popularity of dedicated taxes was that they reduced taxpayer resistance by guaranteeing that the tax would be used to benefit those who paid it. *Id.*

The study then noted that earmarking curtailed the exercise of budgetary controls and simply amounted to an abdication of legislative responsibility. *Id.* at 29–30.

Throughout the discussion of earmarking, the study used the terms revenues, funds, and taxes interchangeably. *Id.* at 27–30.

This study resulted in the inclusion in the constitution of an express prohibition of dedicated funds. As originally proposed by committee, this section read: *"All revenues shall be deposited in the state treasury without allocation for special purposes...."* 6 Alaska Const.Conv.Proceed., app. V, at 106–07 (emphasis added). In the commentary accompanying the committee's proposed article, the motivation that prompted the inclusion of the restriction on earmarking was expressed:

> Even those persons or interests who seek the dedication of revenues for their own projects will admit that the earmarking of taxes or fees for other interests is a fiscal evil. But if allocation is permitted for one interest the denial of it to another

draw an analogy between the use of the plain meaning rule in the interpretation of enacted law and the former rule for the interpretation of contracts where a preliminary finding of ambiguity was required before extrinsic sources could be consulted. *Id.*

Despite the *North Slope* decision, several of our subsequent cases have nevertheless applied the mechanical plain meaning rule. *Horowitz v. Alaska Bar Ass'n*, 609 P.2d 39, 41 (Alaska 1980); *City & Borough of Juneau v. Thibodeau*, 595 P.2d 626, 635 (Alaska 1979); *White v. Alaska Ins. Guaranty Ass'n*, 592 P.2d 367, 369 (Alaska 1979); *Hafling v. Inland Boatmen's Union of the Pacific*, 585 P.2d 870, 872 (Alaska 1978).

The true issue in interpreting enacted law is the conflict between the meaning the enacting body intended and the meaning conveyed to others. 2A Sutherland, Statutory Construction § 48.02, at 18–5 (4th ed. 1973). The conflict is between what the sender meant and what the receiver understands. *Id.* § 45.08, at 22. The "plain meaning" rule has its basis in this conflict. Obviously, there are elements of unfairness where legislative intent is used to vary the apparent meaning of statutory words. *Id.* § 48.02, at 185–86. This has led some members of the judiciary to reject completely the consideration of legislative intent. Justice Holmes once remarked that "we do not inquire what the legislature meant; we ask only what the statute means." *Id.* § 45.07, at 20. On the other hand, most decisions speak in terms of legislative intent as if nothing else mattered in interpretation. *Id.*

Neither extreme expressed above provides a realistic and workable approach to the reconciliation of the intent and meaning approaches to

the interpretation of enacted law. Part of the problem stems from ambiguity being a relative concept. Words have no intrinsic meaning; what is clear to one person is ambiguous and obscure to another. *Id.* § 45.02, at 4–5. As one court stated: "We think the statute is plain on its face, but since words are necessarily inexact and ambiguity is a relative concept, we now turn to the legislative history, mindful that the plainer the language, the more convincing contrary legislative history must be." *United States v. United States Steel Corp.*, 482 F.2d 439, 444 (7th Cir. 1973), *cert. denied* 414 U.S. 909, 94 S.Ct. 229, 38 L.Ed.2d 147. In our recent decision of *State v. City of Haines*, 627 P.2d 1047, 1049 n.6 (Alaska 1981), we interpreted *North Slope* as having adopted just such a sliding scale approach as articulated in *United States Steel.* Our cases listed above are therefore no longer authoritative to the extent that they hold for a mechanical application of the plain meaning rule.

5. Alaska Statehood Commission, Constitutional Studies (1955). This publication, consisting of three volumes, collected staff research papers on other constitutions. The papers were prepared under the authority of the Alaska territorial legislature for use at the constitutional convention. Ch. 108 SLA 1949. These studies were mailed to all delegates before the convention convened and were available for use, and often referred to, in the proceedings. Alaska Statehood Committee, Handbook for Delegates to the Alaska Constitutional Convention 4 (1955).

is difficult, and the more special funds are set up the more difficult it becomes to deny other requests until the point is reached where neither the governor nor the legislature has any real control over the finances of the state. In one Rocky Mountain state the legislature is free to appropriate only 17 per cent of the tax collections; the rest are dedicated. In Alaska at present, 27 per cent of territorial funds are earmarked, primarily for school construction and roads.

*Id.* at 111.

After presentation of the nondedication provision by the Finance and Taxation Committee, it was the subject of much debate and consideration. However, before significant discussion had taken place on the section, the committee sought to have it amended to its present form, changing the words "all revenue" to "the proceeds of any state tax or license." 4 Alaska Const.Conv. Proceed. 2361.

Under the original, all-inclusive prohibition of the dedication of "all revenues," there is no doubt that it was intended to prohibit any and all dedications. The committee intended it to prohibit not only the dedication of taxes, but also such revenue as the proceeds from the sale of state lands. *See* 3 Alaska Const.Conv.Proceed. 2317–19. The committee's spokesman stated that the purpose of the proposed amendment was to allow for the setting up of certain special funds, such as sinking funds for the repayment of bonds, but to prohibit the earmarking of any special tax to that sinking fund. 4 Alaska Const.Conv.Proceed. 2363. Thus, the change did not seek to exempt some sources of revenue from the prohibition, but was intended instead to allow necessary dedication of funds once they were received and placed in the general fund. 1975 Alaska Op.Atty.Gen. No. 9 at 10 (May 12). Review of the convention discussion shows that the amendment was not intended to limit the prohibition of earmarking. The convention delegates also used the words

revenue, funds, and taxes interchangeably. 4 Alaska Const.Conv.Proceed. 2361–89, 2401–15; 5 Alaska Const.Conv.Proceed. 3415–20.

A well-researched Alaska Attorney General's opinion reaches the same conclusion. After carefully and minutely detailing the debate of the constitutional convention on the point, the opinion states:

> Section 7 of Article IX of the state Constitution can be given its intended effect and serve its repeatedly expressed purpose only if the words "proceeds of any tax or license" are interpreted to mean what their framers clearly intended, i.e., the sources of any public revenues.
>
> Accordingly, it is our conclusion that the dedication of any source of public revenue: tax, license, rental, sale, bonus-royalty, royalty, or whatever is limited by the state Constitution to those existing when the Constitution was ratified or required for participation in federal programs.

1975 Alaska Op.Atty.Gen. No. 9 at 24 (May 2).[6]

■ We agree and hold that since the constitution prohibits the dedication of any source of revenue, including both "taxes" and "special assessments," the assessments authorized by AS 16.10.530 are "proceeds of a state tax or license," within the meaning of article IX, section 7, whether or not the salmon assessments fit the definition of "special assessments."

**C.** *Is Section 530 Nonetheless Valid as an Exercise of the Enumerated Powers Contained in the Natural Resources Article?*

The defendants claim that the legislature's power to deal with natural resources of the state, contained in article VIII, gives the legislature the power to create a dedicated fund, despite the express prohibition of dedicated funds contained in article IX, section 7. They particularly emphasize the legislature's and the state's powers to pro-

---

**6.** *See also,* 1978 Alaska Op.Atty.Gen. No. 22 (June 2); 1959 Alaska Op.Atty.Gen. No. 7 (March 11).

vide facilities for the development of fisheries under section 5[7] and the power to promote the development of aquaculture under section 15.[8]

■ Despite defendants' contentions to the contrary, section 530 assessments are an exercise of the taxing power, the purpose of which is to raise revenue to construct hatcheries. Nothing contained in article VIII can be construed to grant the legislature the power to ignore other express constitutional limitations on its taxing power just because it is legislating in an area that concerns natural resources, such as fisheries or aquaculture.

### III. DOES SECTION 530 IMPERMISSIBLY DELEGATE THE LEGISLATURE'S TAXING POWERS TO PRIVATE ASSOCIATIONS AND A STATE ADMINISTRATIVE AGENCY?

The plaintiffs present two major grounds upon which they claim section 530 should be held to be unconstitutional delegation of the legislature's taxing power. First, they contend that the taxing power is an essential legislative power which cannot be delegated by the legislature. Second, they assert that the state constitution expressly provides that the legislature's taxing power may be delegated to boroughs and cities only.

The associations and the state maintain that the regional associations constitute service areas in the unorganized borough and that under the state constitution the state may validly delegate taxing powers to such a service area.

■ In this case, two types of delegation made by section 530 are questioned. The first is the discretion vested in the Commissioner of Commerce and Economic Develop-

ment to approve the salmon assessments. The second is the delegation to the regional associations of the decision to impose the assessment. Because we have determined that the delegation to the regional association is unconstitutional, we need not reach the question whether the delegation to the Commissioner is an impermissible delegation to an administrative agency.

We think article X, section 2 of the state constitution makes it clear that the legislature may not delegate its taxing power to an entity other than a borough or a city. The legislature is, of course, free to itself impose an assessment on limited entry permit holders, but it may not create an independent entity with authority to decide whether to impose the tax. The Alaska Constitution's framers sought to proscribe just such entities when they wrote the constitutional provisions at issue here.

The framers of the Alaska Constitution were aware of and were determined to avoid the proliferation of special districts with taxing powers that had occurred in other states. Thus, article X, section 1 provides in relevant part:

The purpose of this article is to provide for maximum local self-government with a minimum of local government units, and to prevent duplication of tax-levying jurisdictions.

Section 2 of the same article states:

All local government powers shall be vested in boroughs and cities. The State may delegate taxing powers to organized boroughs and cities only.

Examination of the convention proceedings shows the delegates' determination to ensure centralized planning and coordination of government functions by limiting the taxing power to governmental units

---

7. Article VIII, section 5 of the Alaska Constitution provides in relevant part: "The legislature may provide for facilities, improvements, and services ... to assure fuller utilization and development of the fisheries ...."

8. Article VIII, section 15 of the Alaska Constitution provides in relevant part: "No exclusive right or special privilege of fishery shall be created or authorized in the natural waters of the State. This section does not restrict the power of the State to limit entry into any fishery ... to promote the efficient development of aquaculture in the State."

with broad rather than specialized concerns. *See* 4 Alaska Const.Conv.Proceed. 2611–7, 2701–3. *See also* Alaska Statehood Commission, Constitutional Studies, *supra*, pt. VIII, 3–8, 18–24, 51–64.[9]

The report made by the convention delegates to the voters also expresses this sentiment. It states:

The convention sought to provide for a simple, flexible system of local government adapted to the needs of the people of Alaska. It was determined to guard against the creation of unnecessary local units and taxing authorities or the establishment of anything like the typical county with its tight unchangeable boundaries, its heavy overhead of elected officials, and independent boards, and its inadequate powers and finances.

There will be just two classes of local governments: boroughs and cities.

*Proposed Constitution for the State of Alaska: A Report to the People of Alaska from the Alaska Constitutional Convention 3.*

In an effort to get around the prohibitions on the delegation of taxing powers contained in article X, sections 1 and 2 of the constitution, the defendants rely on the following provisions:

First, section 5 of article X provides: Service areas to provide special services within an organized borough may be established, altered, or abolished by the assembly, subject to the provisions of law or charter. A new service area shall not be established if, consistent with the purposes of this article, the new service can be provided by an existing service area, by incorporation as a city, or by annexation to a city. The assembly may authorize the levying of taxes, charges, or assessments within a service area to finance the special services.

Second, Section 6 of the same article states:

The legislature shall provide for the performance of services it deems necessary or advisable in unorganized boroughs, allowing for maximum local participation and responsibility. It may exercise any power or function in an unorganized borough which the assembly may exercise in an organized borough.

Third, AS 16.10.380(c) provides:

(c) A qualified regional association, when it becomes a nonprofit corporation under AS 10.20, is established as a service area in the unorganized borough under AS 29.03.020 for the purpose of providing salmon enhancement services.

The defendants argue that AS 16.10.380(c) is effective to make the regional associations service areas within the unorganized borough since the two associations here cover mostly unorganized borough area. They then maintain that the legislature may, by acting in the role of a borough assembly, grant an association independent taxing powers, as service areas in an unorganized borough under article X, section 6.

■ The trial court found this argument unpersuasive under the circumstances of this case. We agree.

First, the service areas envisioned in sections 5 and 6 must either be "within a . . . borough" under section 5, or "in unorganized boroughs" under section 6. This is certainly not true in the present case where two associations span the entire Alaska panhandle, an area that includes several organized boroughs and cities.

Second, the statute states that the private, nonprofit corporation itself becomes the service area. Such an association is

---

**9.** One of the convention delegates expressed this sentiment as follows:

I think the purpose of this article is to simplify our governmental procedure and also to prevent an overlapping of government functions. Now, we have two governmental functions set up here, the cities and the boroughs. I think that is plenty. They can provide for everything including the schools.

So now, if the camel gets his head is the tent . . . he probably will be all in the tent, bringing with him the amendments that established public utility districts, health districts, public improvement districts, and we will be right back to our old method of numerous taxing bodies which we want to get away from.

4 Alaska Const.Conv.Proceed. 2699–700.

completely independent of any government control. In addition, there is no representative relationship between its directors, officers, and members and the commercial fishermen to whom it is to provide services. AS 16.10.380. Such an entity has no political responsibility and cannot be granted unfettered discretion in governing a "service area."

In conclusion, then, we hold that the statute impermissibly delegates the taxing power to the regional associations, violating article X, section 2 of Alaska's constitution.

## IV. DID THE TRIAL COURT ERR IN CERTIFYING THE SUIT AS A CLASS ACTION?

The associations and the state raise two issues upon which they claim the trial court erred in certifying the plaintiff's class. First, they claim that the trial court erred in certifying the class after the court had already passed on the merits of the case in the summary judgment motions. Second, they maintain that the trial court erred in finding that the representative parties would fairly and adequately protect the interests of the class. These two aspects are discussed below.[10]

A. *Did the Trial Court Err in Deciding the Merits of the Action Before Deciding Whether to Certify the Fishermen's Class?*

The fishermen brought their suit as a class action from the time of the original complaint. Early in the case, the plaintiffs moved the court for class certification and the court issued an order finding that two of the requirements of a class action had been met; namely that the class of plaintiffs was so numerous that joinder of all members would be impracticable and that there were questions of law common to the class. Alaska R.Civ.P. 23(a)(1), (2). Later, the plaintiffs again moved for class certification. While this motion was still pending, the defendant associations and the state filed a motion for summary judgment. The plaintiffs replied with their own summary judgment motion. The court then gave its partial summary judgment order in favor of the plaintiffs. Finally, the trial court subsequently certified the class.

The defendants maintain the trial court erred in entering the judgment on the merits before it certified the class action. They rely on Civil Rule 23(c)(1), which provides in relevant part: "As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained."

Relying on the identical federal rule in *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), the United States Supreme Court held that a trial court may not hold a preliminary hearing on the merits of a case to determine whether a plaintiff is likely to prevail on his claims so as to allow the imposition of the costs of class notice on the defendant. *Id.* at 177–78, 94 S.Ct. at 2152, 40 L.Ed.2d at 748–49. Defendants contend this holding implies that under no circumstances may a court decide the merits of a case before passing on the issue of class certification.

■ While some courts have indeed required that class certification precede a determination of the merits,[11] it is apparent that any right to such a procedure can be

---

**10.** The parties and the court below have treated this class action as one brought pursuant to Civil Rule 23(b)(3). On examination, it is apparent that this type of suit fits within Rule 23(b)(2), and possibly also within Rule 23(b)(1). Professor Moore states:

> If an action can be maintained under (b)(1) and/or (b)(2), and also under (b)(3), the court should order that the suit be maintained as a class action under (b)(1) and/or (b)(2), rather than under (b)(3), so that the judgment will have res judicata effect as to all the class (with no member having the right to opt out), and not defeat the policy underlying the (b)(1) and (b)(2) class suits.

3B J. Moore, Federal Practice ¶ 23.31[3], at 23–262 (1980) (footnote omitted).

**11.** *Peritz v. Liberty Loan Corp.,* 523 F.2d 349, 353–54 (7th Cir. 1975); *Home Savings & Loan Ass'n v. Superior Court,* 42 Cal.App.3d 1006, 117 Cal.Rptr. 485 (1974).

waived, either expressly[12] or impliedly.[13] We have no difficulty finding a waiver under the facts of this case. The plaintiffs diligently sought adjudication of the class action issues by twice moving for certification. The defendants initiated summary judgment proceedings while plaintiffs' second motion for certification of the class action was pending. Under these circumstances, the trial court did not err in ruling on the merits and then certifying the class.

B. *Did the Trial Court Err in Finding that the Named Plaintiffs Provided Adequate Representation for the Class?*

Civil Rule 23(a)(4) provides that a class action can be maintained only if "the representative parties will fairly and adequately protect the interests of the class." The defendants contend that the plaintiffs could not provide adequate representation for the class because they had interests antagonistic to other members of the class.

■ First, the determination of the adequacy of representation in a class action is a question of fact. *Guerine v. J & W Investment, Inc.*, 544 F.2d 863, 864 (5th Cir. 1977); 7 C. Wright & A. Miller, Federal Practice and Procedure § 1765, at 622–23 (1972). As a question of fact, the trial court's finding will not be reversed unless clearly erroneous; in other words, the trial court will not be reversed unless, in light of the whole record, it can be said with a definite and firm conviction that the trial judge was clearly mistaken. *Alaska Foods, Inc. v. American Mfrs. Mut. Ins. Co.*, 482 P.2d 842, 848 (Alaska 1971).

■ Second, in order to bar a suit, the antagonism "must be as to the subject matter of the suit." *Berman v. Narragansett Racing Ass'n*, 414 F.2d 311, 317 (1st Cir. 1969), *cert. denied*, 396 U.S. 1037, 90 S.Ct. 682, 24 L.Ed.2d 681 (1970); 7 C. Wright & A. Miller, *supra*, § 1768, at 639; 3B J. Moore, *supra* note 8, ¶ 23.07[3], at 23–237.

Third, it should be noted that in a suit to strike down a statute as unconstitutional, the requirement of adequate representation loses vitality. The effect of a finding of unconstitutionality will affect everyone, not just the parties before the court. "Thus, even if [a] plaintiff is not a proper representative in the traditional sense, striking a class claim will not effectively change the end result if the party successfully proceeds on an individual basis." 7 C. Wright & A. Miller, *supra*, § 1771, at 664. *See also* 3B J. Moore, *supra* note 8, ¶ 23.40[3], at 23–299 n.15. In the present case, this would simply mean that the named plaintiffs would be burdened with the expenses of the suit without reimbursement from a class recovery. The effect of the action on the defendants and the rest of the class is the same whether the suit is brought as a class or as an individual action.

Finally, it should be noted that in a suit seeking to have a statute declared unconstitutional, there are only two sides to the argument; either the statute is constitutional or it is not. In such a case where there are no inherent conflicts *inter se* among class members (such as rights to differing shares in a limited fund), the interests of class members antagonistic to the representatives' constitutional attack will usually be adequately represented by the defendants.

■ In the present case, the trial court was not clearly erroneous in finding the representation of the class to be adequate. First, the major antagonism claimed was that most of the fishermen in the region had supported, by their votes, mandatory assessments. Since the basis of this suit is the seeking of a declaration of the constitutionality of a statute, the rights of all class members are affected in the same way, whether or not it is brought as a class action. Moreover, the defendant associa-

---

**12.** *Colwell Co. v. Superior Court*, 50 Cal.App.3d 32, 123 Cal.Rptr. 228, 230 (1975); *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 762 (3d Cir. 1974) (en banc), *cert. denied*, 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1975).

**13.** *Civil Serv. Emp. Ins. Co. v. Superior Court*, 22 Cal.3d 362, 149 Cal.Rptr. 360, 584 P.2d 497, 502–04 (Cal.1978); *Peritz*, 523 F.2d at 354 n.4; 3B J. Moore, *supra* note 8, ¶ 23.50, at 23–425 to 23–428.

tions and the state have vigorously opposed the constitutional attack of the plaintiffs and have thereby necessarily represented the interests of antagonistic class members to have the statute declared constitutional.

## V. DID THE TRIAL COURT ERR IN FINDING THE DOCTRINE OF LACHES INAPPLICABLE?

The trial court held that the doctrine of laches was inapplicable on the facts of the present case. On appeal the defendants have contested this finding and both sides have extensively argued the traditional elements of laches, unreasonable delay and resulting prejudice. However, the discussion of the elements of laches is irrelevant since laches is simply inapplicable to any of the remedies sought in this case.

The suit seeks three basic forms of relief. First, a refund of all assessments paid under the statute is sought on a common count. Since this is a general assumpsit common-law cause of action for the refund of taxes wrongly paid, the six-year statute of limitations contained in AS 09.-10.050(3) would apply to this action at law. *State v. Wakefield Fisheries, Inc.*, 495 P.2d 166, 172 (Alaska 1972). The other two types of relief sought, a declaratory judgment and a permanent injunction, are *prospective* in application and seek to prevent future threatened harm. A laches analysis is simply inappropriate, since each new assessment would give rise to a new cause of action.

## VI. DID THE COURT ERR IN FINDING THE DOCTRINE OF EXHAUSTION OF ADMINISTRATIVE REMEDIES INAPPLICABLE?

The trial court was correct in holding inapplicable the doctrine requiring the exhaustion of administrative remedies before seeking relief in the superior court. *See* Davis, Administrative Law Treatise § 20.04 (1st ed. 1958). This was not an administrative adjudicatory proceeding which had various routes of administrative appeal. Rather, the implementation of the salmon assessment was administrative leg-islative action not subject to appeal. The only action which the fishermen could take in the administrative process was to vote in the election on a proposed assessment. There simply were no administrative remedies to exhaust.

The judgment of the superior court is AFFIRMED in all respects.