**ALASKA NATIONAL INSURANCE COMPANY, Appellant,**

**v.**

**NORTHWEST CEDAR STRUCTURES, INC., Bond No. 6875489 Issued by United Pacific Insurance Company, Travelers Casualty & Surety Company, Steve E. Pavich, and Rodney R. Robertson, Appellees.**

**No. S–11747.**

Supreme Court of Alaska.

March 9, 2007.

76. *See* NPMC 2.36.270(D), .300(B).

Diane F. Vallentine and Mark P. Melchert, Jermain, Dunnagan & Owens, Anchorage, for Appellant.

Charles G. Evans, Law Offices of Charles G. Evans, Anchorage, for Appellee Travelers Casualty & Surety Company.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

A construction contractor failed to pay premiums to its workers' compensation insurer. The insurer sued the contractor's statutory surety bond, claiming the failure to pay was "a breach of contract in the conduct of the contracting business" within the meaning of the contractors' licensing statute, AS 08.18. Because the breach was not of a contract for the sort of activities the licensing statute addresses, we hold that the insurer cannot recover against the bond and therefore affirm the judgment below.

## II. FACTS AND PROCEEDINGS

The parties stipulated in the superior court to the relevant facts: Alaska National Insurance Company issued a workers' compensation insurance policy to Northwest Cedar Structures, Inc., a construction contractor. Premium payments for this insurance were initially estimated; the premium was adjust-

able during the policy period and at the end of the policy period an audit determined the final premium due, based on the number of hours worked and the type of work performed by covered employees. Northwest Cedar failed to pay Alaska National nearly $80,000 in premiums due. Alaska National then sued Northwest Cedar, its $10,000 contractor's surety bond, and the insurer that issued Northwest Cedar's surety bond (United Pacific Insurance Company, now owned by Travelers Casualty & Surety Company).

The superior court held Northwest Cedar in breach of contract for failing to pay the workers' compensation insurance premiums and entered judgment for Alaska National against Northwest Cedar, but ruled on cross-motions for summary judgment that Alaska National could not recover against the statutory surety bond because the legislature did not intend contractors' surety bonds to cover such general overhead expenses "as rent, telephone, electric, car lease," and workers' compensation insurance. It also reasoned that to be covered, the breached contract must be "a contract in the contracting business in the course of a construction project."

Alaska National appeals. The only issue it raises is whether it can recover against the statutory surety bond in partial satisfaction of its judgment against Northwest Cedar for breach of contract. Appellee Travelers Casualty & Surety Co. does not challenge the breach of contract ruling and agrees that the unpaid premiums exceed the amount of the $10,000 surety bond.

## III. DISCUSSION

### A. Standard of Review

We review grants of summary judgment de novo.[1] We also review legal determinations de novo and apply our independent judgment to statutory interpretation, adopting the rule of law most persuasive in light of precedent, reason, and policy.[2]

### B. "Breach of Contract in the Conduct of the Contracting Business" in AS 08.18.071(a)(3) Means Breach of a Contract for Activities of the Sort Described in AS 08.18.171(4).

Alaska Statute 08.18.071 requires a general contractor in Alaska to have a $10,000 surety bond that covers specified types of claims.[3] Alaska Statute 08.18.081(a) provides that anyone "having a claim against a contractor ... for any of the items referred to in AS 08.18.071 may bring suit upon the bond." Alaska National argues that the superior court erred in ruling that Northwest Cedar's surety bond did not cover Northwest Cedar's breach of its contract to pay the workers' compensation insurance premiums. It contends that the court departed from the plain meaning of AS 08.18.071(a)(3) and instead based its reading of the statute on unsupported assumptions about the intent of the legislature.

The parties dispute the meaning of the statutory bonding scheme. Both parties invoke plausible, but not necessarily equally persuasive, public policy arguments to support their readings of the statutory provisions.

This case turns on the relevant statutory language. There is no contention here that the words of the bond or that general principles of contract law provide greater protection to Alaska National than do the relevant words of the statute.[4]

1. *In re Life Ins. Co. of Alaska,* 76 P.3d 366, 368 (Alaska 2003).

2. *Id.*

3. Although the legislature has amended AS 08.18.071 twice since the breach at issue here, *see* ch. 134, §§ 14–15, SLA 2003 and ch. 106, § 3, SLA 2004, the amendments do not affect the issue presented in this case. We therefore generally refer to the current version of the statute. We refer to the former version as needed.

4. When a surety bond is given to satisfy a statutory obligation, the relevant statutory provisions are incorporated into the bond. *See* 11 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 163:39 (3d ed.2005) (noting that "[a]lthough there is some authority to the contrary" the general rule is to read statutory requirements into bond coverage). In this case, the surety bond's coverage language incorporates, almost verbatim, the language of AS 08.18.071(a). The outcome here therefore turns on the meaning of the statute.

To determine whether Alaska National can pursue the bond, we must determine whether the claim is for "any of the items referred to in AS 08.18.071."[5] Alaska Statute 08.18.071(a) specifies the items the bond must cover. Former AS 08.18.071(a) required Northwest Cedar's bond to cover these items:

(1) taxes and contributions due the state and political subdivisions;

(2) persons furnishing labor or material or renting or supplying equipment to the applicant; and

(3) amounts that may be adjudged against the applicant by reason of negligent or improper work or breach of contract in the conduct of the contracting business or by reason of damage to public facilities occurring in the course of a construction project.[6]

Only subsection .071(a)(3) arguably applies here. Is the contractor's breach of its promise to pay the workers' compensation premiums a "breach of contract in the conduct of the contracting business" within the meaning of AS 08.18.071(a)(3)?

To interpret a statute we must "consider its language, its purpose, and its legislative history, in an attempt to give effect to the legislature's intent, with due regard for the meaning the statutory language conveys to others."[7] "In order to interpret a statute contrary to its plain meaning, 'the plainer the language, the more convincing contrary legislative history must be.' "[8]

Alaska National argues that AS 08.18.071(a)(3) is "clear and unambiguous." It contends that the words "breach of contract in the conduct of the contracting business" are not limited to "the actual construction of improvements or performance of work on a construction project pursuant to a construction contract," but rather extend to the broader realm of "contracts entered into in connection with the conduct of [a contractor's] contracting business." Thus, Alaska National seems to suggest that any contracts that are in some way related to a contractor's business must be covered by the bond. Travelers counters that Alaska National "employs ... a technical reading of the statute" that ignores the legislative intent and leads to "a harsh and unrealistic result." Because we think it clear that Alaska National's claim on the bond is outside the scope of subsection .071(a)(3), we need not craft a comprehensive standard establishing the line between covered and uncovered breaches of contract. We consider here only whether Alaska National's claim for unpaid workers' compensation premiums is covered by Northwest Cedar's statutory bond.

Subsections .071(a)(1)-(3) set out three classes of expenses covered by the surety bond. They include (1) taxes and contributions; (2) labor, material, or equipment; and (3) amounts adjudged against the contractor for tortious conduct, breach of contract, or damage to public facilities.

As to this third class, subsection .071(a)(3) refers to "negligent or improper work or breach of contract in the conduct of the contracting business" and to "damage ... occurring in the course of a construction project." To cover, as Alaska National proposes, the breach of the contract to pay workers' compensation premiums, we would have to read in isolation these words of subsection .071(a)(3): "breach of contract in the conduct of the contracting business" without considering their meaning in light of the surrounding words. We are reluctant to read the quoted words in isolation because

5. AS 08.18.081(a).

6. Former AS 08.18.071 (2002). AS 08.18.071(a)(3) now reads, "amounts that may be adjudged against the applicant by reason of negligent or improper work or breach of contract in the conduct of the contracting business *or home inspection activity, as applicable,* or by reason of damage to public facilities occurring in the course of a construction project." (Emphasis added.) The underlined words were added in 2003. Ch. 134, § 14, SLA 2003.

7. *In re Estate of Maldonado,* 117 P.3d 720, 725 (Alaska 2005) (quoting *Alyeska Pipeline Serv. Co. v. DeShong,* 77 P.3d 1227, 1234 (Alaska 2003)) (internal quotation marks omitted).

8. *Alderman v. Iditarod Props., Inc.,* 32 P.3d 373, 393 (Alaska 2001) (quoting *State v. Alex,* 646 P.2d 203, 208–09 n. 4 (Alaska 1982)).

the subsection's other words seem to describe this class of claims in terms of the contracting work and provide interpretive context.

But even focusing narrowly on the words "breach of contract in the conduct of the contracting business" provides little support for the reading Alaska National advances. To avoid rendering "in the conduct of the contracting business" superfluous, we must read it as limiting the scope of "breach of contract." [9] The former phrase must have been intended to distinguish between those contract breaches to be covered by the statutory bond and those not covered. Without this distinction the bond would cover *all* breaches of contract by a contractor, without regard to whether the contract has any connection to the contractor's contracting business. Subsection .071(a)(3) provides some clues about this intended distinction. The phrase "in the conduct of the contracting business" contains two such clues. First, "the contracting business" singles out contracting. Because the entire chapter applies to those engaged in the business of contracting, "contracting" in subsection .071(a)(3) would be superfluous unless it was intended to help limit the scope of coverage to a subset of all business activities of contractors. Second, "in the conduct of the contracting business" implies activity ("conduct") in the contracting business itself.

The words of the subsection therefore provide little support for, or even disfavor, a reading that covers a breach of a contract that is not central to the "conduct of the contracting business."

A larger view of AS 08.18 helps determine what the legislature intended, and militates against the interpretation Alaska National proposes.

Title 8 of the Alaska Statutes regulates a variety of businesses and professions. Its chapters address forty professions, from accountants [10] to veterinarians.[11] Chapter 18 regulates construction contractors and home inspectors. It requires contractors to register and prohibits persons from bidding or working as contractors until they have received certificates of registration.[12] It forbids a contractor registered under one name from acting as a contractor under another unregistered name,[13] requires a contractor's advertisements and contracts to include the registration number,[14] requires an applicant for a certificate of registration to file a surety bond satisfying statutory specifications,[15] and, as seen above, permits persons having claims against a contractor "for any of the items referred to in AS 08.18.071" to bring suit on the bond.[16] Chapter 18 requires proof of insurance, including workers' compensation insurance "to the extent required" by the Alaska Workers' Compensation Act.[17] It also provides for enforcing the requirements,[18] for citations,[19] for suspension and revocation of registration,[20] for civil penalties,[21] and for criminal penalties and prosecution.[22]

The legislature, in adopting these requirements, must have concluded that the contracting business required this regulation. Absent a definitive expression of purpose in the statute or the legislative history, the best

9. *See Kodiak Island Borough v. Exxon Corp.*, 991 P.2d 757, 761 (Alaska 1999) ("We must ... presume 'that the legislature intended every word, sentence, or provision of a statute to have some purpose, force, and effect, and that no words or provisions are superfluous.' " (quoting *Rydwell v. Anchorage Sch. Dist.*, 864 P.2d 526, 530–31 (Alaska 1993))).

10. AS 08.04.005–.690.

11. AS 08.98.010–.250.

12. AS 08.18.011(a).

13. AS 08.18.051(a).

14. AS 08.18.051(b).

15. AS 08.18.071(a).

16. AS 08.18.081(a).

17. AS 08.18.101.

18. AS 08.18.116.

19. AS 08.18.117.

20. AS 08.18.121.

21. AS 08.18.131.

22. AS 08.18.141.

explanation for the scope of regulation can be derived from the statutory list of activities that bring a person within the bonding and licensure requirements of Chapter 18. That list is found in AS 08.18.171(4), which defines a "contractor":

> "contractor" means a person who, in the pursuit of an independent business, undertakes or offers to perform, or claims to have the capacity to perform, or submits a bid for a project to construct, alter, repair, move, or demolish a building, highway, road, railroad, or any type of fixed structure, including excavation and site development and erection of scaffolding; "contractor" includes a general contractor, builder, mechanical contractor, specialty contractor, and subcontractor.

This definition thus describes two core activities of the profession: actually doing work of the sort described, and doing specified things (undertaking, offering, holding out as able, bidding) directed at forming contracts to do that work. Both activities relate directly to either performing contracted-for work or obtaining contracts to perform work. Neither aspect implicates the sort of routine business activities common to many other businesses. We assume that the legislature chose to regulate contractors because it was concerned about the risks resulting from the activities identified in subsection .171(4).

Reading the definition of "contractor" together with former AS 08.18.071(a)(3) suggests that the legislature intended to limit statutory contract breach claims, and thus claims against the bonds, to breaches of contracts that are directly related to the sorts of listed activities that caused the legislature to conclude that regulation was necessary. The definition of "contractor" helps distinguish the sorts of activities bonds were intended to cover from the sorts common to other, less-regulated businesses. Supporting this distinction is the definition's equal interest in formation of construction contracts; this suggests that the contracts discussed in subsection .071(a)(3) are also the contracts that are the subject of subsection .171(4). Applying this distinction, a contractor's breach of contract to pay workers' compensation premiums should be excluded from coverage, as the contract is not directly related to the conduct of the work of the contractor.

Alaska National argues that the language of the final clause of subsection .071(a)(3), "damage to public facilities occurring in the course of a construction project," distinguishes it from the language found in the prior clause, "in the conduct of the contracting business." Alaska National reasons that the legislature, if it had intended the coverage of the breach of contract provision to be narrow, would have used the language found in the final clause.

But, as we saw from the statutory definition of "contractor," the chapter addresses both the conduct of performing a contract and the conduct of obtaining, or attempting to obtain, a contract.[23] The legislature, in drafting subsection .071(a)(3), could have logically distinguished between physical damage to public facilities occurring during a project (even a project between private parties and not for public works) and non-physical harm suffered by a party to a construction contract.

In any event, this argument at most suggests that "occurring in the course of a construction project" may be narrower than "in the conduct of the contracting business." It does not suggest that "in the conduct of the contracting business" encompasses performance or formation of contracts that are not construction contracts.

Our interpretation of subsection .071(a)(3) is thus consistent with the seeming purpose of the registration and bonding requirements.[24] The legislature presumably imposed these requirements because it was concerned about the risks resulting from the sorts of work contractors agree to do, and from their efforts to obtain contracts to do that work.[25]

23. AS 08.18.171(4).

24. *See Jones v. Short,* 696 P.2d 665, 667 (Alaska 1985) ("[P]roper interpretation of the registration provisions is one which carries out the legislative intent.").

25. *See, e.g., Asdourian v. Araj,* 38 Cal.3d 276, 211 Cal.Rptr. 703, 696 P.2d 95, 98 (1985) ("The general purpose of the [contractor license] law is to guard the public against the consequences of

Alaska National offers its own interpretation of the purpose of the contractor's registration statute to support a broad reading of AS 08.18.071(a)(3). As it points out, we have previously stated that "[r]egistration was intended by the legislature to ensure 'competence and financial responsibility in those who undertake work as contractors.' "[26] But even though the surety bond is intended to help ensure financial responsibility, it does not follow that the legislature intended that the statutory bond back every financial dealing of a contractor.

Alaska National also looks to AS 08.18.081(a) to support its interpretation of subsection .071(a)(3). Subsection .081(a) specifies priorities for five classes of claims against surety bonds.[27] The fourth class is "claims for breach of contract."[28] But subsection .081(a) simply sets claim priorities; it does not purport to define, or redefine, the types of claims listed in subsection .071(a). And, as it happens, its words offer no help in interpreting the words of subsection .071(a)(3).

Alaska National also argues that the priorities set in subsection .081(a) effectively preclude insurance companies from exhausting these surety bonds. But the first question is whether breach of a contract for insurance is covered at all. Moreover, all breach of contract claims have equal priority, so paying an insurer limits the bond's ability to cover other contract claims, including those of project owners harmed by breach of a construction contract. Finally, subsection .081(a) specifies no priority for negligent or improper work.

Alaska National asserts that legislative history supports a broad reading of AS 08.18.071. The 1968 Report of the Judiciary Committee on House Committee Substitute for SB 161 indeed states that the bond was intended to guarantee payment "for *any* breach of contract and any damage done to public facilities."[29] (Emphasis added.) Although the report literally states that "any" breach of contract is covered, the accuracy of a literal reading of the report is undermined by the fact the report also states that the bond unqualifiedly covers "any" damage done to public facilities. The statute is clear that damage done to public facilities is not covered unless the damage occurs in the course of a construction project.[30] There is no indication the legislature wanted to protect everyone who might incidentally contract with contractors for purposes not directly connected with the type of work described in AS 08.18.171(4). We therefore regard the report as generally summarizing the subject of the bill, not as attempting to specify its exact scope. We therefore give the report no weight in interpreting the text of the statute.

It is logical to conclude that the legislature intended subsection .071(a)(3) to limit breach of contract bond coverage to construction contracts. If the subsection were construed more broadly, the bond would be easily exhausted, leaving some creditors unprotected.[31] Per AS 08.18.071(b), a general contractor must have a $10,000 surety bond and a specialty contractor must have a $5,000 surety bond. Such bonds are relatively modest given the amounts potentially at stake if there are claims of negligent or defective work or breach of contract to perform work; such bonds would be reduced, if not exhausted, if they must also broadly cover all business-related contracts. The surety bond is not a project-specific performance bond; it must cover all "claims pending at one time,"

incompetent workmanship, imposition and deception.") (internal quotation marks omitted).

26. *Gross v. Bayshore Land Co.*, 710 P.2d 1007, 1012 (Alaska 1985) (quoting *Sumner Dev. Corp. v. Shivers*, 517 P.2d 757, 763 (Alaska 1974)).

27. AS 08.18.081(a)(1)-(5).

28. AS 08.18.081(a)(4).

29. *See Balboa Ins. Co. v. Senco Alaska, Inc.*, 567 P.2d 295, 296 (Alaska 1977) (quoting Report of the Judiciary Committee on HCS for Senate Bill No. 161, 1968 House Journal at 545).

30. AS 09.18.071(a)(3) covers "damage to public facilities occurring in the course of a construction project."

31. Although *Balboa Insurance Co. v. Senco Alaska, Inc.*, 567 P.2d 295, 297 (Alaska 1977), expressed a similar observation, that case is not directly controlling because the statute interpreted in *Balboa* has since been amended.

and the surety is not liable in an aggregate amount exceeding the bond.[32]

We conclude that the words "breach of contract in the conduct of a contracting business" in AS 08.18.071(a)(3) were intended to protect contracting parties for whom the danger of breach is central to the activity of contracting—especially parties whose ability or incentive to investigate contractors is limited. Alaska National contends that because Northwest Cedar was qualified for coverage through the assigned risk pool, also called the Alaska Plan, Alaska National did not have the option of refusing to cover Northwest Cedar.[33] But insurers generally have an opportunity to manage and spread risk of non-payment of premiums; their ability to avoid or spread the risk and cost of contract defaults exceeds that of most individuals who contract with contractors. That workers' compensation premiums are paid by many employers and that insurance companies are for-profit organizations capable of minimizing the risk of premium default helps confirm that the surety bond was not intended to cover such transactions.

Alaska National points out that a contracting business must have workers' compensation insurance to carry out construction projects. It argues that because workers' compensation insurance is essential to the business of contracting, the failure to pay premiums for such insurance is a breach of contract "occurring in the conduct of the contracting business." [34] Most employers must have workers' compensation insurance, subject to statutory exceptions.[35] But many other services are also important or essential to conducting a contracting business, or indeed, any business, and some are mandated by statute. That does not mean a contract for those other services is covered by subsection .071(a)(3).

It is fair to conclude that the legislature singled out contractors for bonding and registration requirements because it thought the activities described in AS 08.18.171(4) pose significant risks. Given that purpose, we are not persuaded that the legislature required contractors to have surety bonds in order to cover the sort of routine contract breaches common to most businesses. A contract for workers' compensation insurance is not unique to the contracting business. It is little different than a contract for other overhead expenses common to many businesses in Alaska. As the superior court correctly concluded, the surety bond requirement was not intended to cover such general expenses as "rent, telephone, electric, car lease" that are not subject to the unique risks and uncertainties of the contracting business. Many other businesses must also have workers' compensation insurance. In addition to workers' compensation insurance, contractors likewise must have casualty insurance, telephone service, and vehicles, but that does not mean that their need to obtain those services and products caused the legislature to regulate them and require bonds.

Alaska National asserts that limiting the bond's breach of contract coverage to breach of construction contracts would render the breach of contract provision "largely superfluous." But it concedes that such a narrow reading would nonetheless require the bond to cover the contractor's complete failure to perform the work or its failure to pay subcontractors. Even if these were the only two contract breaches covered by the statute, they demonstrate that the provision is not superfluous.

32. AS 08.18.081(a).

33. *See* 3 Alaska Administrative Code (AAC) 30.030 (requiring all insurers to participate in assigned risk pool and provide coverage to eligible employers otherwise unable to secure workers' compensation insurance).

34. AS 08.18.071(a)(3). Alaska National contended at oral argument that "workers compensation certainly is in a very real sense consumed in the course of a construction project" and hence should be treated much like labor or materials that are consumed. It is unclear if Alaska National means this literally, or is simply arguing by analogy. In either case, we agree with the majority of modern courts that workers' compensation insurance is not like labor or materials. *See United States ex rel. Cobb–Strecker–Dunphy & Zimmerman, Inc. v. M.A. Mortenson Co.*, 894 F.2d 311, 313 (8th Cir.1990) (discussing cases construing the Miller Act).

35. AS 23.30.045, .230.

Finally, Alaska National contends that the "availability of a registration bond to guarantee a contractor's agreement to pay premiums has the effect of keeping costs for workers' compensation insurance lower." It suggests that these policy concerns are even more acute here because Northwest Cedar obtained its workers' compensation policy through the assigned risk pool, also known as the Alaska Plan. The Alaska Plan is a state-created plan that provides workers' compensation coverage to employers who cannot otherwise obtain a policy.[36] Because losses under the plan must be distributed throughout the assigned risk pool, Alaska National's inability to recover from the Northwest Cedar's bond will theoretically increase premiums for all employers under the Plan.[37] Alaska National argues that the result will be "increased premiums for those employers in Alaska that cannot otherwise obtain workers' compensation insurance coverage, a result contrary to the Legislature's goals [in creating the Alaska Plan]."

Our focus here is on determining the legislature's purpose when it enacted the Title 8 bonding and registration requirements in 1968;[38] the legislature's goals in authorizing assigned risk pools under Title 21 almost a decade later[39] are not relevant to this inquiry. Furthermore, even assuming the effect on Alaska Plan premiums would not be trivial, we are not convinced that the policy goals of the Alaska Plan or any other part of the workers' compensation system should trump any competing policy goals furthered by reading the bonding statute requirement as we do here. Any policy concerns potentially relevant to the workers' compensation system do not outweigh the need to avoid exhausting modest statutory surety bonds on general overhead expenses.[40] Finally, consideration of such policy concerns is inappropriate when, as here, the meaning of a statute is reasonably clear.[41]

## IV. CONCLUSION

For these reasons, the judgment of the superior court is AFFIRMED.

FABE, Justice, not participating.

MATTHEWS, Justice, concurring.

A.

The question in this case is whether the language of AS 08.18.071(a)(3), "breach of contract in the conduct of the contracting business," refers to any breach of contract by a contractor relating to its contracting business or, more narrowly, only to breaches directly related to the performance of a building contract.[1] I think this is a close question because the statutory language could reasonably be read to encompass either definition. If we were to adopt the first meaning, contracts for a wide variety of overhead items—office equipment, rent, insur-

36. *See* 3 AAC 30.010 *et seq.*

37. *See* 3 AAC 30.030(f)(5).

38. Ch. 100, § 2, SLA 1968.

39. *See* ch. 252, § 1, SLA 1976 (allowing director of insurance to require insurers to participate in assigned risk pool); 3 AAC 30.010 *et seq.* (effective 1977) (creating Alaska Plan).

40. This conclusion makes it unnecessary to speculate about whether shifting the risk of workers' compensation insurance premium defaults to surety bond issuers would increase the cost of the statutory bonds for all contractors.

41. Alaska National also argues in reliance on Washington's interpretation of its registration statute. Washington's statute predated Alaska's, but it has been amended several times after our legislature enacted AS 08.18 in 1968, and our legislature did not have the benefit of Washington appellate decisions issued after 1968. We do not find Washington law helpful in interpreting AS 08.18.071 in this case.

1. I use the term "building contract" here as shorthand for contracts to undertake projects listed in the statutory definition of the word "contractor" in AS 08.18.171(4). The listed projects may only be undertaken by a registered contractor. AS 08.18.171(4) provides:

> "[C]ontractor" means a person who, in the pursuit of an independent business, undertakes or offers to perform, or claims to have the capacity to perform, or submits a bid for a project to construct, alter, repair, move, or demolish a building, highway, road, railroad, or any type of fixed structure, including excavation and site development and erection of scaffolding; "contractor" includes a general

ance—would be covered by a contractor's bond. Under the narrow definition, only contract breaches directly related to a specific project, such as a failure to complete a building on time, would be covered. I slightly favor the narrow definition for one of the reasons relied on by today's opinion.

Like other businesses, contractors must make a wide variety of contracts. But only contractors can undertake and perform building contracts. Since other businesses are not required to post bonds, it seems likely that the legislature meant contractor's bonds to cover only those activities unique to contractors. This is the point made by the opinion of the court on pages 8 through 10 and it seems sufficient to tip the scales in favor of the narrow definition.

B.

The superior court relied heavily on *Balboa Insurance Co. v. Senco Alaska Inc.*[2] in concluding that workers' compensation insurance premiums are not covered by a statutory contractor's bond. I think that it is worth noting that *Balboa* has been overruled by a statutory change and therefore has doubtful precedential effect.

The *Balboa* court held that the seller of an air compressor to a contractor had no claim on the contractor's bond where the compressor was not incorporated into or used up on any particular project.[3] This seems surprising since AS 08.18.071(a)(2) then, as now, covered persons supplying equipment to a contractor. But the court read subsection (5) of the exemptions section of the statute, AS 08.18.161, to exclude the transaction.[4] That section provided that "[t]his chapter does not apply to ... (5) the sale or installation of finished products, materials, or articles of merchandise which are not actually fabricated into and do not become a permanent, fixed part of a structure." The *Balboa* court read this provision as referring to, and thus disqualifying from bond coverage, sales of construction equipment *to* a contractor.[5]

But this extremely narrow reading is no longer possible. In 2003 the legislature amended the lead-in language of section .161 so that it now begins with the phrase "[t]o the extent that this chapter governs contractors, this chapter does not apply to."[6] This amendment indicates that subsection (5) refers to sales *by* a potential contractor rather than *to* a contractor. Under the amendment a seller is not required to register as a contractor based on sales described in subsection (5). But sales to a contractor are not excluded by section .161 from bond coverage.

Judged at least by the 2003 amendment, the *Balboa* court construed the registration statute too narrowly. This mistaken reading potentially taints the inferences that the court drew concerning the intended coverage of the bonding provision. Therefore, in my view, *Balboa* should no longer be considered to have precedential value either as to its direct holding or as to its dicta concerning the intended scope of bond coverage.

For the reason expressed in Part A of this concurring opinion, I agree to affirm the decision of the superior court.

contractor, builder, mechanical contractor, specialty contractor, and subcontractor[.]

2. 567 P.2d 295 (Alaska 1977). The superior court referred to *Balboa* as "the most relevant case" to the present question.

3. *Id.* at 296–97.

4. *Id.* at 297.

5. *Id.*

6. AS 08.18.161(5) currently provides:

> *To the extent that this chapter governs contractors,* this chapter does not apply to
>
> ...
>
> (5) the sale or installation of finished products, materials, or articles of merchandise that are not actually fabricated into and do not become a permanent, fixed part of a structure[.]

(2003 amendments are underlined.)