*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| BROOKE CORKERY and PATRICK CORKERY, | ) ) ) | Supreme Court No. S-16684 |
| Appellants, | ) ) | Superior Court No. 3AN-15-06252 CI |
| v. | ) ) | O P I N I O N |
| MUNICIPALITY OF ANCHORAGE, | ) ) | No. 7292 – September 14, 2018 |
| Appellee. | ) ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Dani Crosby, Judge.

Appearances: David D. Clark, Law Office of David Clark, Anchorage, for Appellants. Samuel C. Severin, Assistant Municipal Attorney, and Rebecca A. Windt-Pearson, Municipal Attorney, Anchorage, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

BOLGER, Justice.

## I.    INTRODUCTION

Homeowners appeal the denial of their application for a variance by the Municipality of Anchorage Zoning Board of Examiners and Appeals. The homeowners' house exceeds the 30% lot coverage limit for their zoning district by over 10% due to a renovation performed in 1983 by a prior owner. The Board denied the variance

application because it concluded that three of the seven standards required to grant a variance had not been satisfied. On appeal, the homeowners challenge the Board's interpretation of the variance standards. They also argue that the equitable doctrine of laches bars the Board from denying their variance request. Finally, the homeowners argue that the Board's consideration of a memo written by a Municipality attorney violated their due process rights and that this violation warrants a trial de novo in the superior court.

After independently interpreting the variance standards, we agree with the Board's interpretation. In light of our de novo interpretation of these variance standards, any error in the memo's legal advice or in the process of the Board's consideration is harmless and does not warrant trial de novo. We also conclude that the homeowners cannot invoke the defense of laches because, in the zoning context, this defense is available only to defendants in a zoning enforcement action, and here the homeowners are plaintiffs seeking affirmative relief. We therefore affirm the superior court's decision affirming the Board's denial of the homeowners' variance request.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Patrick and Brooke Corkery have owned their Anchorage home since 1998. The house sits on an 11,250-square-foot[1] corner lot; the lot slopes downhill to the southwest at a minor grade. The Municipality of Anchorage originally issued a certificate of occupancy in 1965 permitting a two-story, 2,359-square-foot house on the lot. In 1965 (and currently) the lot was zoned in R-1A, for which the maximum lot

---

[1]    This is the recorded plat size, but a 2014 survey indicated that the lot is actually 10,970 square feet. This minor discrepancy does not affect the outcome of this case.

coverage is 30%. In 1969 a building permit was issued for the addition of a 184-square-foot greenhouse to the home.

In 1983 a prior owner substantially expanded the house so that the new lot coverage significantly exceeded the 30% limit. Although the former owner claims she secured all necessary building permits for the addition, the Municipality has no record of any permit being issued for the home expansion. The home's footprint is currently 4,401 square feet. The footprint of the home has not increased since 1983, with the exception of 60 square feet that the Corkerys added to the deck (without obtaining a permit) in 2011. The Municipality has since taxed the property based on the increased square footage.

In 2013 the Corkerys were replacing the home's roof when they discovered significant rot in the roof and in the wall between the home interior and the attached greenhouse. This damage apparently placed the greenhouse at risk of imminent structural failure and required immediate attention. The Corkerys applied for a construction permit to tear down and rebuild the greenhouse. In August 2014 the Municipality issued the Corkerys a conditional permit that allowed them to perform the necessary repairs at their own risk but required them to apply for and obtain a zoning variance before a certificate of occupancy would be issued for the home following the repairs. The variance was required because the footprint of the home exceeded 30% of the lot coverage and therefore violated the R-1A zoning restriction.[2]

---

[2] *See* Anchorage Municipal Code (AMC) 21.40.030(H) (2015) (setting maximum lot coverage for R-1A zoned districts at 30%). All citations to Title 21 (the zoning portion) of the AMC in this opinion are to the "old code," which expired on December 31, 2015, because this code was in effect when the Corkerys applied for the variance and they elected to have their application reviewed under it.

**B.    Zoning Board Of Examiners And Appeals Proceedings**

The Corkerys applied for a zoning variance in October 2014 to allow a lot coverage of 40.12%, a variance of 10.12% over the permitted lot coverage. Their application urged that a variance was required in order to allow the home "to remain and obtain occupancy." In a later addendum to their application, the Corkerys offered to remove the portion of their deck that they had added in 2011 along with a portion of the deck that encroached on the secondary front-yard setback (which would reduce the total lot coverage to 39.4%) but otherwise proposed maintaining the home's current footprint.

Municipality planning staff conducted an analysis of the variance application and issued a memo recommending that the application be denied. In making this recommendation, the memo considered the seven standards used to evaluate applications for a variance from zoning regulations:

a.    There exist exceptional or extraordinary physical circumstances of the subject property such as, but not limited to, streams, wetlands, or slope, and such physical circumstances are not applicable to other land in the same district;

b.    Because of these physical circumstances, the strict application of this code would create an exceptional or undue hardship upon the property owner, and would deprive the applicant of rights commonly enjoyed by other properties in the same district under the terms of the zoning ordinance;

c.    The hardship is not self-imposed, and special conditions and circumstances do not result from the actions of the applicant and such conditions and circumstances do not merely constitute inconvenience;

d.    The variance, if granted, will not adversely affect the use of adjacent property as permitted under this Code;

e. The variance, if granted, is in keeping with the intent of this Code, will not change the character of the zoning district in which the property is located, and will not permit a use that is not otherwise permitted in the district in which the property lies;

f. The variance, if granted, does not adversely affect the health, safety, and welfare of the people of the Municipality of Anchorage; and

g. The variance granted is the minimum variance that will make possible a reasonable use of the land.[3]

The memo concluded that four of the seven standards, standards one, two, three, and seven, were not substantially met.[4] The memo recommended in the alternative that, if the Board found that all the standards were satisfied, it should grant the variance on the condition that a 325-square-foot deck, including the portion added in 2011, be removed.

In November 2014, while the Corkerys' variance application was pending, assistant municipal attorney Quincy Hansell wrote a memo to senior municipal planner Margaret O'Brien entitled "Update on Variance Law." The Hansell memo was drafted in response to an August request from O'Brien for an update on the law governing variance requests. O'Brien's request stemmed from an argument made by a party in a recent variance proceeding. The party contended that our opinion in *City & Borough of Juneau v. Thibodeau*[5] had been overruled. At the time that she requested the legal opinion, O'Brien had no knowledge of the Corkerys' case — indeed, their variance

---

³ AMC 21.15.010(C)(1). The memo, the Board, and the parties refer to these standards by number rather than letter, and we do the same.

⁴ *See* AMC 21.15.010(C), (F)(1) (providing that the Board must find that the variance application "substantially meets" the seven standards before the Board may grant the variance).

⁵ 595 P.2d 626 (Alaska 1979).

application had not yet been submitted — and O'Brien did not learn of the Corkerys' application until about one year after requesting the memo.

The Hansell memo makes a very brief reference in its introduction to the specific case that spurred O'Brien's request, but otherwise its analysis is framed in general terms and does not reference a specific case. The memo first concludes that the relevant portion of *Thibodeau* — in which we set out the standard for granting a variance — was still good law. It asserts that the only portion of *Thibodeau* that had been subsequently overruled related to an ancillary issue of statutory interpretation.[6] The Hansell memo then provides an overview of the law governing variance requests, including this court's case law, the relevant Anchorage Municipal Code provisions, and case law from other jurisdictions. The crux of the memo's message on this point was the paucity of Alaska-specific case law on variance standards. The memo concludes by stating:

> There is very little case law available to indicate any trend in Alaska because very few decisions made at the local level are appealed. Nationwide, the trend in case law over recent years shows a strengthening of the standards for granting variances. Yet studies show that at the local level, boards tend to grant most requests for variances — with little regard to any rules of law expressed by the courts. We imagine many of these would be overturned, if appealed. We expect the [Board] to diligently apply and follow the law to avoid generating costly appeals. (Footnotes omitted.)

O'Brien received the Hansell memo and distributed it to the Board's members in early December 2014. A week later, on December 11, the Board held the first of two hearings in which it reviewed the Corkerys' variance application. After

---

[6]     *See State v. Alex*, 646 P.2d 203, 208 n.4 (Alaska 1982) ("Our cases listed above [including *Thibodeau*] are . . . no longer authoritative to the extent that they hold for a mechanical application of the plain meaning rule.").

presentations from both municipal staff[7] and the Corkerys' representative, the Board voted to postpone voting on the application. The postponement was to allow municipal planning staff to provide additional information, including whether the Corkerys' home was eligible for nonconforming rights. Municipal staff indicated that if the Corkerys obtained a nonconforming-rights determination for the lot coverage, a variance would not be necessary.[8] After voting for postponement, the Board Chair noted that he had not "had a chance to read the [Hansell memo] that was in [the Board's] packet," but he planned to ask questions about it at the next meeting. Another Board member responded that he had read the Hansell memo and "[i]t added clarity as hoped for," but he was "interested in other [B]oard members' comments either offline or at the next meeting to help further guide [him] in [his] efforts to act appropriately."[9]

The Board again considered the Corkerys' variance application at its January 8, 2015 meeting. At the conclusion of the hearing, the Board denied the application by a vote of 4-2. One of the Board members referenced the Hansell memo in explaining her vote for denial.

---

[7] At the hearing the Municipality appeared to change its position from that in the planning staff memo with regard to standard three. It stated that standard three was "partially met" and noted that "removing . . . over a thousand square feet from the existing house is considered more than just an inconvenience."

[8] A structure is eligible for nonconforming status if it lawfully "existed at the original effective date of adoption . . . of applicable regulations" and has not increased its nonconformity since that date. AMC 21.55.040(A). If a structure is determined to be nonconforming, it "may be continued so long as it remains otherwise lawful," notwithstanding the applicable zoning regulations. *Id.*

[9] After the first hearing, the municipal planning staff issued a supplementary memo addressing whether the Corkerys' home was eligible for nonconforming rights. The supplementary memo concluded that the home was not eligible for nonconforming status because the expansion of the house postdated enactment of the lot coverage limit.

In its written findings of fact issued two months later, the Board found that standards one, two, and seven were not met. Standard one was not met because "[t]he physical condition of the land [did] not contribute to the need for a variance from lot coverage." The findings noted that the dissenting Board members found this standard met based on the lot's corner position and sloping topography, as well as the discrepancy between the recorded plat size and the lot's actual size. The Board found that standard two was not met because, even if the lot was oddly shaped and sloping, these physical circumstances did "not necessitate increasing the building footprint over the maximum allowed." The dissenting members stated, however, that "reducing the lot coverage would be an undue hardship because parts of the house would need to be removed." Finally, the Board found that standard seven was not satisfied because the Corkerys could make reasonable use of the property without the variance. The dissenters countered that this standard was met because "removing over 1,000 square feet of building footprint to meet the maximum lot coverage requirement is not reasonable."

## C. Superior Court Proceedings

The Corkerys appealed the Board's decision to the superior court. During the superior court proceedings, the Corkerys sought to obtain the Hansell memo from the Municipality because Board members had referenced it during the hearings. After initially refusing on the basis of attorney-client privilege, the Municipality ultimately waived the privilege and produced the memo but objected to the Corkerys relying on the memo in their appeal. The Corkerys then moved to add the memo to the record on appeal, arguing that it was necessary to the resolution of their case. They also requested a trial de novo in the superior court on the basis that "the [Municipal] Attorney's Office secretly poisoned the well" in the Board proceedings by distributing the Hansell memo to the Board "shortly before the Corkerys['] variance petition was heard." (Emphasis omitted.)

The superior court denied the Corkerys' motion to expand the record on appeal to include the Hansell memo. After the superior court denied their motion for reconsideration, the Corkerys petitioned this court for interlocutory review; we denied the petition. While that petition was pending, the superior court denied the motion for a trial de novo.

Proceedings continued in the superior court, where the Corkerys raised three primary arguments: the Board incorrectly interpreted the variance provision to require compliance with all seven standards, rather than just a substantial number of them; their existing home constituted an exceptional or extraordinary physical circumstance necessitating a variance; and the Municipality was barred by the doctrine of laches from refusing to grant the variance. The superior court rejected each of these arguments and affirmed the Board's decision to deny the variance.

The Corkerys appeal the superior court's decision.

## III.  STANDARD OF REVIEW

"When the superior court acts as an intermediate appellate court, we independently review the merits of the underlying administrative decision."[10]  As a general matter, our "review of zoning board decisions is narrow and . . . a presumption of validity is accorded those decisions."[11]  However, in this case the Corkerys allege that the Board's interpretation of the variance standards in the zoning code was improperly influenced by the Hansell memo.  Accordingly, we decline to grant deference to the Board's interpretation here and instead interpret the variance standards de novo,

---

[10]     *Heller v. State, Dep't of Revenue*, 314 P.3d 69, 72 (Alaska 2013).

[11]     *Native Vill. of Eklutna v. Bd. of Adjustment*, 995 P.2d 641, 643 (Alaska 2000) (omission in original) (quoting *S. Anchorage Concerned Coal., Inc. v. Coffey*, 862 P.2d 168, 173 (Alaska 1993)).

exercising our independent judgment.[12]  We interpret the variance standards "according to reason, practicality, and common sense, considering the meaning of the [ordinance's] language, its legislative history, and its purpose."[13]  We will adopt "the rule of law that is most persuasive in light of precedent, reason, and policy."[14]  Finally, whether the doctrine of laches applies to a claim is a question of law reviewed de novo.[15]

## IV.  DISCUSSION

### A.  The Corkerys, As Plaintiffs, Cannot Invoke Laches To Obtain The Affirmative Relief Of A Variance.

The Corkerys argue that they should be permitted to invoke the doctrine of laches to bar the Municipality from denying them a variance.  The Corkerys claim that laches is available to them because, even though they are nominally the plaintiffs in this action (given that they initiated the variance application), they are functionally the

---

[12]  *See Balough v. Fairbanks N. Star Borough*, 995 P.2d 245, 254 (Alaska 2000) ("Where the interpretation of a zoning ordinance presents only a question of statutory construction which does not involve agency expertise or the formulation of fundamental policies, we apply the independent judgment standard of review.").  Our decision to review the variance standards de novo moots the Corkerys' due process arguments relating to the allegedly erroneous legal analysis contained in the Hansell memo.  And we need not decide whether there was any legal error in distributing the memo to the Board because any error was clearly harmless given that the memo does not contain any information specific to this case.  As for the Corkerys' argument that the record should be supplemented to include the Hansell memo, we note that the memo is included in the superior court record for our review.

[13]  *Tweedy v. Matanuska-Susitna Borough Bd. of Adjustment & Appeals*, 332 P.3d 12, 16 (Alaska 2014) (quoting *McDonnell v. State Farm Mut. Auto. Ins. Co.*, 299 P.3d 715, 721 (Alaska 2013)).

[14]  *Id.* (quoting *Gillis v. Aleutians E. Borough*, 258 P.3d 118, 120-21 (Alaska 2011)).

[15]  *Kollander v. Kollander*, 322 P.3d 897, 902 (Alaska 2014).

defendants against the Municipality's denial of an unconditional building permit. According to them, the Municipality's denial of the building permit was "offensive in nature," which put the Municipality "in the position of a plaintiff." Therefore, the Corkerys claim, their resulting variance application was essentially a defense against that denial, and they are permitted to invoke laches as a defense. The Municipality counters that the doctrine of laches may be used only as a "shield" against liability rather than as a "sword" to compel action, i.e., the granting of a variance. The superior court agreed with the Municipality and concluded that the Corkerys could not invoke the doctrine of laches as a basis to reverse the Board's variance denial.

"Laches is an equitable defense available 'when a party delays asserting a claim for an unconscionable period.' "[16] In order for laches to bar a claim, two elements must be shown: (1) the plaintiff unreasonably delayed seeking relief, and (2) this delay has resulted in "prejudice to the defendant."[17] The party raising laches bears the burden of demonstrating these two elements.[18] But before determining whether these two elements are satisfied, we must decide the threshold question whether the laches defense may be invoked by the Corkerys at all.[19]

---

[16] *Burke v. Maka*, 296 P.3d 976, 979 (Alaska 2013) (quoting *Whittle v. Weber*, 243 P.3d 208, 217 (Alaska 2010)).

[17] *Id.* (quoting *Whittle*, 243 P.3d at 217).

[18] *Schaub v. Schaub*, 305 P.3d 337, 343-44 (Alaska 2013).

[19] *See Kollander*, 322 P.3d at 902 (separating the question whether laches applies to the claim from the question whether the elements of laches are satisfied).

We previously considered laches in the context of a zoning dispute in *Jackson v. Kenai Peninsula Borough ex rel. City of Kenai*.[20] That case involved a zoning enforcement action against the owner of an auto repair business located in an area of Kenai zoned for residential use.[21] We concluded that laches did not bar Kenai from bringing the zoning enforcement action, but noted we were not foreclosing the possibility that laches could ever apply in such an action.[22] We instructed, however, that the defense of laches "should not be permitted to frustrate the enforcement of a valid zoning regulation except in the clearest and most compelling circumstances."[23] As an example of a case where laches may be properly invoked as a defense in a zoning enforcement action, we cited the example of an innocent third party purchasing a nonconforming property.[24] The Corkerys rely on *Jackson* to argue that the specific circumstances of their case warrant the application of laches. However, even if we accept that laches may provide a defense to a zoning enforcement action in some circumstances, this conclusion would not control our decision in this case. We have repeatedly and consistently characterized laches as an equitable *defense* that may be asserted by a *defendant*.[25]

---

[20]    733 P.2d 1038 (Alaska 1987).

[21]    *Id.* at 1038-40.

[22]    *Id.* at 1044.

[23]    *Id.* (quoting *Universal Holding Co. v. Twp. of N. Bergen*, 150 A.2d 44, 49 (N.J. Super. App. Div. 1959)).

[24]    *Id.* at 1043.

[25]    *See, e.g.*, *Kollander v. Kollander*, 322 P.3d 897, 903 (Alaska 2014); *Burke v. Maka*, 296 P.3d 976, 979 (Alaska 2013); *Whittle v. Weber*, 243 P.3d 208, 217 (Alaska 2010).

Furthermore many other courts have specifically noted that laches may not be used as a sword to obtain affirmative relief but rather only as a defensive shield.[26] Indeed, in the specific context of a zoning dispute, a Florida appeals court refused to permit a similarly positioned property owner to invoke laches.[27] There, a property owner sued the county seeking a declaration that the owner's building permit was valid after the county attempted to revoke the permit.[28] The owner argued that the county was barred by laches from revoking the permit, where the county had initially granted the permit a decade earlier.[29] The Florida court rejected this argument, reasoning that because laches is "a shield to an action," it had "no application to the case at bar where [the owner was] seeking to use it as a sword" to compel the county to grant a permit.[30]

For similar reasons, laches is not available to the Corkerys. The Corkerys are plaintiffs in this action and are attempting to use laches to compel the Municipality to grant them a variance (or issue them an occupancy permit without a variance). The Corkerys are not defendants in a zoning enforcement action, there is nothing in the record indicating that the Municipality has initiated such an action, and at oral argument the Municipality disclaimed any intention to do so in the future. Our case law provides no basis for allowing the Corkerys, the plaintiffs in this suit, to invoke the defense of

---

[26]     *See, e.g.*, *E.D. Sys. Corp. v. Sw. Bell Tel. Co.*, 674 F.2d 453, 461 (5th Cir. 1982); *Halcon Int'l, Inc. v. Monsanto Austl. Ltd.*, 446 F.2d 156, 159 (7th Cir. 1971); *United States v. Portrait of Wally*, 663 F. Supp. 2d 232, 265 n.24 (S.D.N.Y. 2009); *LaPrade v. Rosinsky*, 882 A.2d 192, 198 (D.C. 2005).

[27]     *Corona Props. of Fla., Inc. v. Monroe Cty.*, 485 So. 2d 1314 (Fla. Dist. App. 1986).

[28]     *Id.* at 1316.

[29]     *Id.* at 1315-16.

[30]     *Id.* at 1318.

laches to compel the Municipality to grant a variance, when the Municipality has not and will not initiate a zoning enforcement action. The superior court therefore did not err in concluding that the Corkerys cannot invoke laches.

**B.      The Board Did Not Err In Interpreting The Variance Provision In The Municipal Code.**

The Corkerys next challenge the Board's interpretation of an Anchorage Municipal Code provision governing variances, AMC 21.15.010(C), on several bases. First, they argue that the Board incorrectly interpreted this provision to require that a variance application meet all seven standards in order for the variance to be granted. Second, they argue that the Board interpreted standard one, requiring "exceptional or extraordinary physical circumstances of the subject property,"[31] too narrowly so that it excluded artificial structures on the property. Finally, they argue that the Board erred in its interpretation of standard two, which requires "exceptional or undue hardship,"[32] because the Board afforded insufficient weight to the challenge of conforming their home to the lot coverage restriction. As noted above, we will interpret all portions of the variance provision de novo, without deference to the Board's construction.

**1.      The variance provision requires an applicant to substantially meet each of the seven variance standards.**

The Corkerys first challenge the Board's interpretation of AMC 21.15.010(C). Anchorage Municipal Code 21.15.010 provides the procedure for obtaining a variance. Subsection (C) provides that a variance application may be initiated only by the property owner or the owner's authorized representative and that any application for a variance "must specify the facts or circumstances that are alleged

---

[31]      AMC 21.15.010(C)(1)(a).

[32]      AMC 21.15.010(C)(1)(b).

to show that the application substantially meets the following standards."[33]  Subsection (C)(1) then lists the seven standards used to evaluate an application for a variance from zoning regulations.[34]  The Board implicitly interpreted subsection (C) to require a variance applicant to satisfy all seven standards in order for the application to be granted. The Corkerys argue that the plain text of the provision does not require that a variance applicant satisfy *all* of the seven standards but rather only a substantial portion of them. The Corkerys assert that because the Board found four of the seven standards satisfied, substantially all of the seven standards are met.

The issue posed by this argument is whether the phrase "substantially meets" requires a variance application to substantially meet *each* of the seven standards or requires the application to meet only a substantial number of the seven standards.  The former reading is more natural.  Subsection (C) requires a variance application to "substantially meet[] the . . . standards" — not to "meet substantially all of the standards" or "meet a substantial number of the standards."

This interpretation is supported by two key features of subsection (C). First, this provision lists each of the seven standards separately, and the final standard, standard seven, is preceded by the word "and."  The choice of "and," rather than "or," or simply no conjunction, to precede the final standard evinces the Municipal Assembly's intent that all seven standards be satisfied in order for a variance to be granted.[35]

---

[33]    AMC 21.15.010(C).

[34]    AMC 21.15.010(C)(1).

[35]    *See City & Borough of Juneau v. Thibodeau*, 595 P.2d 626, 634 (Alaska 1979) (concluding that both of the variance standards under Juneau code must be satisfied, based in part on use of the conjunction "and" between standards), *overruled on*

(continued...)

Second, the seven factors themselves are partially interdependent. Standards one and two build on each other, and each appears to assume the satisfaction of the other. Standard one requires that the property contain "exceptional or extraordinary physical circumstances."[36] And standard two requires that "[*b*]*ecause of these physical circumstances,* the strict application of [the zoning] code would create exceptional or undue hardship upon the property owner."[37] Standard two, by referring to the "physical circumstances" required under the first standard, assumes that the first standard is satisfied. This assumption is warranted only if all seven standards must be satisfied in order for a variance to be granted. In other words, as the superior court noted, the standards are "interrelated, and they do not 'stand alone' well," meaning that an applicant cannot satisfy the second standard without also satisfying the first. Although the remaining five standards are not necessarily phrased in an interdependent manner, the wording of standards one and two demonstrates that an applicant must satisfy all seven standards.

Another subsection of AMC 21.15.010 underscores the indication of subsection (C) that all seven standards must be satisfied in order for an applicant to obtain a variance. Subsection (F), entitled "Approval," establishes what is required in order for the Board to approve a variance request. It mandates that the Board "shall conduct an inquiry designed to find whether *all the standards* for issuance of the

---

[35]     (...continued)
*other grounds by State v. Alex*, 646 P.2d 203 (Alaska 1982); *cf. State v. Fyfe*, 370 P.3d 1092, 1100 (Alaska 2016) (noting that the use of conjunction " 'or' is 'to mark an alternative such as either this or that' " (quoting *In re Jesusa V.*, 85 P.3d 2, 24 (Cal. 2004))).

[36]     AMC 21.15.010(C)(1)(a).

[37]     AMC 21.15.010(C)(1)(b) (emphasis added).

variance have been met."[38]  It goes on to require that the Board make sufficient factual findings to support its decision and that a majority of the Board vote for the variance in order for it to be granted.[39]

When construing a municipal ordinance, "we must, whenever possible, interpret each part or section . . . with every other part or section, so as to create a harmonious whole."[40]  The language of subsection (F) strongly suggests that all of the standards in subsection (C) must be met in order for the Board to grant the variance.  If the Assembly had intended for only substantially all of the standards to be met, it likely would have used different language in subsection (F).

The Corkerys protest that it is possible to interpret subsection (F) in a different fashion.  They argue that this subsection's reference to "all the standards" simply refers to the three requirements of subsection (C):  only the property owner or the owner's representative can initiate a variance application; the variance application must state with particularity the relief sought and the facts; and the application must show that substantially all of the seven standards are met.  Therefore, according to the Corkerys, subsection (F) does not require that all seven standards be met in order for the Board to grant a variance request.

However, this argument is contradicted by the text of subsection (C), which refers to the list of seven standards as the relevant "standards":  "The application must state with particularity the relief sought and must specify the facts or circumstances that

---

[38]     AMC 21.15.010(F)(1) (emphasis added).

[39]     *Id.*

[40]     *Alaska Airlines, Inc. v. Darrow*, 403 P.3d 1116, 1127 (Alaska 2017) (quoting *State, Dep't of Commerce, Cmty. & Econ. Dev., Div. of Ins. v. Progressive Cas. Ins. Co.*, 165 P.3d 624, 629 (Alaska 2007)).

are alleged to show that the application substantially meets *the following standards*."[41] It is true that subsection (C) itself is entitled "Standards" and includes the requirements that the application may be initiated only by the property owner or the owner's representative and that the application must state with particularity the relief sought and the facts. But the plain text of the subsection indicates that the seven separately listed standards are the relevant standards by which a zoning variance application must be judged. And we interpret "the same words used twice in the same [ordinance] [to] have the same meaning."[42] Therefore, to the extent that subsection (F)'s reference to "all the standards" is ambiguous, we glean from subsection (C) that this phrase is referring to the list of seven standards. Accordingly, the Corkerys' argument that subsection (F) does not indicate that all seven standards must be satisfied is unavailing.

As their final counterargument, the Corkerys claim that if all seven standards must be satisfied in order for a variance to be granted, then the use of "substantially" in subsection (C) would be superfluous, contrary to this court's statutory interpretation principles.[43] However, an interpretation that requires compliance with all seven standards would not render the word "substantially" superfluous. Under an interpretation that requires compliance with all seven standards, "substantially" still carries meaning because it indicates that an application need only substantially meet — as opposed to *completely* meet — each of the seven standards. Therefore our

---

[41] AMC 21.15.010(C) (emphasis added).

[42] *ARCTEC Servs. v. Cummings*, 295 P.3d 916, 923 (Alaska 2013) (quoting *Fancyboy v. Alaska Vill. Elec. Coop., Inc.*, 984 P.2d 1128, 1133 (Alaska 1999)).

[43] *See State v. Fyfe*, 370 P.3d 1092, 1099 (Alaska 2016) (stating the presumption that a legislative body does not use superfluous words in statutory text and "intend[s] 'every word . . . of a statute to have some purpose, force, and effect' " (quoting *Adamson v. Municipality of Anchorage*, 333 P.3d 5, 16 (Alaska 2014))).

interpretation does not render the word "substantially" superfluous but instead imbues it with independent meaning distinct from that of an identical ordinance that does not contain the word "substantially."

In sum, the text of subsection (C) and the ordinance as a whole indicates that all seven standards must be substantially met in order for the Board to grant a variance request.

### 2. Only physical features of the applicant's land constitute "exceptional or extraordinary physical circumstances of the subject property" under variance standard one.

The Corkerys next argue that the Board misinterpreted the scope of variance standard one. Standard one requires that the variance applicant show "[t]here exist exceptional or extraordinary physical circumstances of the subject property such as, but not limited to, streams, wetlands, or slope, and such physical circumstances are not applicable to other land in the same district."[44] The Corkerys contend that they satisfy this standard because their home was expanded to substantially exceed the lot coverage limitation long before they purchased it. They reason that because the home is part of the "property," circumstances relating to the home, such as excessive lot coverage, constitute extraordinary circumstances of the "property." They fault the Board for requiring them to show extraordinary circumstances relating to the land comprising their lot.

The Municipality counters that "[t]he plain language" of standard one requires that the physical circumstances "be features of the 'land'" such as "slope, streams, and other naturally occurring features." The Municipality argues that the Corkerys do not satisfy this standard because "[a] man-made structure on the property is not a feature of the land." The Municipality notes our opinion in *Thibodeau*, where

---

[44] AMC 21.15.010(C)(1)(a).

we discussed what sort of circumstances warranted a variance under the Juneau variance provision.[45] The provision at issue stated that the Juneau Board of Adjustment could grant a variance "[w]here hardships and practical difficulties resulting from peculiarities of a specific property render it difficult to carry out the provisions of [the zoning code]."[46] We interpreted "peculiarities of a specific property" to be limited to those circumstances that "arise *from the physical conditions of the land itself* which distinguish it from other land in the general area."[47] But, as the Municipality implicitly concedes, our interpretation of the Juneau provision is not binding in this case, where we are asked to interpret the Anchorage variance provision, whose text differs from that of the Juneau provision.

Several features of the variance provision indicate that the term "physical circumstances of the subject property" is limited to physical features of the land itself and does not include any artificial structures built on the land. First, the plain text of standard one weighs in favor of this interpretation. In addition to requiring the presence of "physical circumstances of the subject property," standard one also requires that the circumstances "are not applicable to other *land* in the same [zoning] district."[48] By referring to circumstances of the "land," the text suggests that such circumstances are limited to naturally occurring ones and do not include artificial structures on the lot.

Standard one also provides specific examples of qualifying circumstances, and these examples demonstrate that such circumstances are limited to naturally

---

[45] *See City & Borough of Juneau v. Thibodeau*, 595 P.2d 626, 635 (Alaska 1979), *overruled on other grounds by State v. Alex*, 646 P.2d 203 (Alaska 1982).

[46] *Id.* at 632.

[47] *Id.* at 632, 635 (emphasis added).

[48] AMC 21.15.010(C)(1)(a) (emphasis added).

occurring features of the land itself. Standard one states that qualifying circumstances may include, "but [are] not limited to, streams, wetlands, or slope."[49] Under the *noscitur a sociis* canon of statutory construction,[50] the meaning of an ambiguous term "may be ascertained by reference to the meaning of other words or phrases associated with it."[51] Applying this principle here leads us to conclude that, to the extent the term "physical circumstances of the subject property" is ambiguous, we can discern from the examples that follow it that the term refers only to naturally occurring features of the land itself.

Other sections of the variance provision likewise focus on the features of the lot's land itself rather than any structures on the land. We must interpret standard one together with these other sections and in a manner that harmonizes any conflicts.[52] Subsection (A) of the variance provision requires that any variance the Board grants

---

[49]    *Id.*

[50]    We apply this broader canon rather than the *ejusdem generis* canon because we recognize that there is some dispute whether the latter can apply where — as here — a general term is followed by specific examples rather than the reverse. *Compare West v. Municipality of Anchorage*, 174 P.3d 224, 228 (Alaska 2007) ("[The ordinance] does not contain a 'list of specifics' preceding the [general phrase]. Instead, only the specific [term] precedes [the general term]. . . . [T]his lack of a list means that *ejusdem generis* does not apply."), *with* 2A NORMAN J. SINGER & SHAMBIE SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 47:17, at 364-70 (7th ed. 2014) ("*Ejusdem generis* instructs that, where general words follow specific words . . . , the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words. The doctrine applies equally to the opposite sequence, i.e., specific words following general ones . . . ." (footnotes omitted)).

[51]    *Olson v. Olson*, 856 P.2d 482, 484 n.2 (Alaska 1993); *see also Dawson v. State*, 264 P.3d 851, 858 (Alaska App. 2011) ("Under the rule of statutory construction known as *noscitur a sociis* (literally, 'it is known by its associates'), the meaning of a word in a statute can be gleaned from the words associated with it.").

[52]    *See Nelson v. Municipality of Anchorage*, 267 P.3d 636, 642 (Alaska 2011).

must "be the minimum variance that will make possible a reasonable use of the *land* equivalent to, but not exceeding, the use of similar *land* permitted generally in the same zoning district."[53] And standard seven requires that, in order to grant a variance, the Board must find that the variance "is the minimum variance that will make possible a reasonable use of the *land*."[54]

In sum, the plain text of standard one along with other sections of the variance provision indicate that the required "exceptional or extraordinary physical circumstances of the subject property" include only physical features of the land itself. Thus we conclude that standard one was intended to encompass the same scope we described when interpreting the Juneau variance provision: "Peculiarities of the specific property sufficient to warrant a grant of a variance must arise from the physical conditions of the land itself which distinguish it from other land in the general area."[55] The excessive lot coverage of the Corkerys' home does not constitute such a circumstance and therefore does not satisfy standard one.[56]

---

[53]     AMC 21.15.010(A) (emphases added).

[54]     AMC 21.15.010(C)(1)(g) (emphasis added).

[55]     *City & Borough of Juneau v. Thibodeau*, 595 P.2d 626, 635 (Alaska 1979), *overruled on other grounds by State v. Alex*, 646 P.2d 203 (Alaska 1982).

[56]     Because we conclude that the Corkerys' home does not satisfy standard one, we do not consider their argument with regard to standard two because this standard is premised on standard one being satisfied. *See* AMC 21.15.010(C)(1)(b) (requiring that "[b]*ecause of these physical circumstances* [described in standard one], the strict application of this code would create an exceptional or undue hardship upon the property owner, and would deprive the applicant of rights commonly enjoyed by other properties in the same [zoning] district under the terms of the zoning ordinance" (emphasis added)). By virtue of failing to satisfy standard one, the Corkerys also fail to satisfy standard two.

## V.  CONCLUSION

We AFFIRM the superior court's decision affirming the Board's denial of the Corkerys' variance request.